## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **KIMBERLY DUFFY,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION No.** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **AVELO AIRLINES, INC.,** | : | |
| **Defendant.** | : | |
| | : | **APRIL 23, 2026** |

## COMPLAINT

### I. INTRODUCTION

1. Plaintiff Kimberly Duffy ("Plaintiff"), a highly credentialed commercial airline captain with thousands of hours of flight experience, brings this action against her former employer, Avelo Airlines, Inc., because it retaliated against her in violation of Connecticut General Statutes § 31-51q, and discriminated against her based on sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

2. While Avelo has publicly proclaimed that "Safety Always" is the company's "number one value," Avelo's actions against Ms. Duffy demonstrate otherwise.

3. On multiple occasions during Plaintiff's employment with Avelo, Ms. Duffy opposed conduct which had the potential to compromise flight safety. Then, on February 20, 2025, Ms. Duffy filed a formal written safety report documenting serious Federal Aviation Administration ("FAA") regulatory violations by a male captain at Avelo, and that complaint required disclosure to the FAA. On February 22, 2025, Ms. Duffy submitted safety concerns to Avelo regarding another male captain.

4. Days later, on February 27, 2025, Avelo terminated Ms. Duffy's employment in an act of retaliation and discrimination.

5. By retaliating against Ms. Duffy, Avelo made it clear that it deemed Ms. Duffy's complaints about unsafe practices as more of a threat than the actual unsafe practices of other male employees about which she complained.

6. During Ms. Duffy's employment, the culture at Avelo's flight operations was also openly hostile to its only female captain. Male pilots discussed the need to "put [her] in her place" because she was a professional woman who "had to be so perfect all the time." Misogynistic materials were distributed among male crew members. Avelo did not terminate the employment of male captains who engaged in conduct that was comparable to, or more serious than, the alleged actions of Ms. Duffy — including male captains who engaged in dangerous and unsafe practices in the cockpit during flight, a male captain who had a heated argument with gate agents, and another who physically struck a female flight attendant.

7. As part of the explanation for Avelo's decision to terminate Plaintiff's employment, Avelo's Chief Pilot proclaimed that Ms. Duffy "has a superior attitude." That statement by one of Avelo's decisionmakers reflects sex stereotyping and bias against a professional woman who knew her aircraft, enforced safety standards, and refused to be silent when she observed federal aviation regulation violations.

8. After Avelo terminated Plaintiff's employment, Defendant subjected Plaintiff to continued acts of retaliation and discrimination that included tarnishing Plaintiff's pilot record with the FAA in a way that has interfered with Plaintiff's ability to obtain a comparable position with another airline, failing to follow through on a conditional offer

of employment to Plaintiff's husband, and issuing a statement to other employees regarding Plaintiff's complaint to the FAA that disparaged Plaintiff, recklessly attempted to undermine the validity of the safety issues she reported, and intended to deter other employees from cooperating with the FAA's investigation. Despite Defendant's efforts, the FAA ultimately substantiated violations by Avelo.

9. Through this action, Ms. Duffy seeks to hold Defendant accountable for its serious violations of federal and state law and to obtain some remedy for the significant harm that she has suffered, and is continuing to suffer, as a result of Defendant's illegal conduct.

## II. PARTIES

10. Plaintiff Kimberly Brooke Duffy ("Plaintiff" or "Ms. Duffy") is an individual currently residing in the State of Florida. During Plaintiff's employment with Defendant, Plaintiff resided in the State of Connecticut. Plaintiff is a highly qualified commercial airline captain with thousands of hours of total flight time, including decades of flight experience comprised of service in both the private sector and with the United States Air Force. Plaintiff possesses extensive Boeing 737 experience, and she holds all required FAA certifications for the aircraft she flew at Avelo.

11. Defendant Avelo Airlines, Inc. ("Avelo" or "Defendant") is a corporation organized under the laws of the State of Nevada, with its principal place of business in Houston, Texas. At all times relevant to this Complaint, Avelo was an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), and Conn. Gen. Stat. 31-51q. Defendant employs more than fifteen (15) employees and engages in an industry affecting commerce. Avelo operates commercial air carrier service out of

Tweed-New Haven Airport (HVN) in New Haven, Connecticut, employing pilots and crew members in the District of Connecticut.

### III. JURISDICTION

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's Complaint presents federal questions and asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  Jurisdiction is also conferred by 28 U.S.C. § 1343(a)(4) and 42 U.S.C. § 2000e-5(f)(3).  Supplemental jurisdiction over Plaintiff's state law claim under Conn. Gen. Stat. § 31-51q is conferred by 28 U.S.C. § 1367, as it arises from the same nucleus of operative facts as the federal claims.

13. The Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.

14. This Court possesses personal jurisdiction over Avelo.  Avelo employs pilots and crew members in Connecticut, operates commercial flights from Tweed-New Haven Airport in New Haven, Connecticut, and the employment relationship and discriminatory acts giving rise to Plaintiff's claims occurred in Connecticut.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within the District of Connecticut, and because Defendant employed Plaintiff within the District of Connecticut.

### IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. On or about November 18, 2025, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), Charge No.

523-2025-02285, alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.

17.   On January 27, 2026, the EEOC issued a Determination and Notice of Rights ("Right-to-Sue Letter"), notifying Plaintiff of her right to bring a civil action under Title VII within ninety (90) days of receipt of the notice.

18.   This Complaint is filed within ninety (90) days of Plaintiff's receipt of the EEOC's Right-to-Sue Letter.  Plaintiff has fully exhausted all administrative prerequisites to the filing of her Title VII claims.

## V. BACKGROUND

### A.    Plaintiff's Employment at Avelo Airlines

19.   Avelo Airlines is a commercial air carrier that commenced passenger operations in 2021 and operates a fleet of Boeing 737 aircraft.  Avelo offers service from Tweed-New Haven Airport (HVN) in New Haven, Connecticut.

20.   Avelo hired Ms. Duffy as a full-time captain effective September 25, 2023.  Ms. Duffy's base was Tweed-New Haven Airport.

21.   Avelo's employment of Ms. Duffy was governed by its Pilot Playbook, the FAA-approved Boeing Flight Crew Operations Manual (FCOM), FAA Airline Transport Pilot Airman Certificate Standards, Safety Management Systems Manual (SMS), and other policies and procedures manuals as required and approved by the FAA.

22.   Applicable standards required flight crew members to call out errors, omissions or any safety events as they happen, directed that they be assertive and persistent enough to make sure that the problems are corrected, and emphasized the importance of flight crew

members reporting and addressing situations that can compromise safety without suffering retaliation.

23. Chief Pilot Robert Lieser ("Lieser") is Avelo's Chief Pilot. Lieser served as Ms. Duffy's direct supervisor and the primary decision-maker regarding discipline and termination of pilots at Avelo.

24. Scott Hall ("Hall") is Avelo's Head of Flight Operations and was also involved in actions against Plaintiff.

25. During the entire period of Ms. Duffy's employment at Avelo, she was the only female captain at the airline.

B.    A Pattern of Sex Discrimination and Retaliation Beginning at Onboarding

26. From the outset of her employment, Ms. Duffy encountered conduct that reflected a culture of discrimination and retaliation at Avelo toward its only female captain.

27. At Avelo, newly hired pilots must complete an initial training period during which Avelo instructors provide training for the new pilots.

28. Avelo has developed specific training manuals and procedures that have been approved by the FAA, and the content of the training is supposed to adhere to the training materials that the FAA has approved.

29. If Avelo provides training and instruction to pilots that is not correct, and/or which deviates from the content of the training materials that the FAA approved, it can compromise flight safety.

30. In October 2023, Ms. Duffy commenced her classroom training at Avelo. When she began her training with Avelo, Ms. Duffy possessed thousands of hours of Boeing 737

experience, which was more experience in the Boeing 737 than the Avelo instructors and far more than virtually any other pilot in her training class.

31. During Ms. Duffy's training, she observed that the Avelo instructors were providing instructions to her and the other pilots that were inaccurate and/or which conflicted with the content of the Avelo training materials that the FAA had approved.

32. Two Avelo instructors told Ms. Duffy and other pilots that wing anti-ice is never required and never used.

33. The statement by the Avelo instructors that wing anti-ice is never required and never used is not only incorrect, but it had the potential to compromise flight safety. Avelo's own FAA-approved procedures identify icing conditions when wing anti-ice should be used, as well as specify a procedure for a wing anti-ice operation when icing conditions are present.

34. Avelo's FAA-approved procedures include information regarding icing conditions and a procedure for a wing anti-ice operation because flight safety sometimes requires the deployment of wing anti-ice.

35. If icing conditions are present, and wing anti-ice is not deployed, it can compromise flight safety.

36. Consequently, Plaintiff spoke up and questioned the instructors regarding their statements about not using wing anti-ice in order to remedy an incorrect instruction that could have compromised flight safety if it was followed by Avelo pilots. As part of the exchange with the instructors, Plaintiff pointed out that their statements were not correct and that they conflicted with Avelo's written procedures that had been approved by the FAA.

37. In another classroom session, Plaintiff pointed out to the instructor that the depiction of the hydraulic panel in the schematic in the Avelo Quick Reference Handbook ("QRH") was incorrect.  Avelo's schematic was dated from a previous year, indicating that the erroneous depiction had been used at Avelo for an extended period of time.  Schematic errors in an emergency procedures manual have the potential to compromise flight safety.  Plaintiff's purpose in raising these concerns was to ensure that Avelo pilots knew that the depiction in the schematic was incorrect so that they were properly equipped to perform their duties in an actual flight situation.

38. In another training session, a male instructor, who was the highest-ranking ground training and simulator instructor at Avelo, stated that course setting windows did not matter when operating an ILS in approach mode on the Mode Control Panel.  That information was incorrect, as radio navigation requires that the course windows conform to the approach course for proper flight guidance, and Avelo's own written procedures that the FAA had approved confirmed the inaccuracy of the instructor's statement.

39. So, during a break from class, Plaintiff spoke with the instructor about the fact that he had provided inaccurate information to the class which deviated from Avelo's own FAA-approved procedures.

40. As part of another training session, Plaintiff spoke up when the instructor provided the class with information regarding auto-pilot and controlling the speed of the airplane that conflicted with the preferred method.

41. Even though the instructor agreed that Plaintiff was correct, he removed Plaintiff from the classroom and yelled at Plaintiff in the hallway.  Plaintiff requested that she and the instructor go to a more private setting, but he refused.  Instead, he proceeded to yell at

Plaintiff in the hallway, and he was so angry and loud that he disrupted other classroom training sessions that were in progress.

42. In December 2023, Ms. Duffy reported aggressive conduct by a simulator instructor named Alberto who summarily cancelled a simulator session and yelled at Plaintiff angrily in the hallway and was loud enough to disrupt other classrooms in session.

43. On the following day, December 7, 2023, Bob Lieser, Avelo's Chief Pilot, along with the Director of Training at Avelo and a representative from Avelo Human Resources, admonished Plaintiff for her behavior in training that included speaking out and correcting instructors who were communicating incorrect information that deviated from Avelo's FAA-approved procedures and manual.

44. On December 7, 2023, Defendant also issued Plaintiff a written performance notice that was included in her personnel file.

45. Even though Defendant indicated to Plaintiff that the performance notice would be removed from her personnel file after one year, Avelo invoked the December 7, 2023 performance notice in the termination letter that Defendant issued to Plaintiff on February 27, 2025, more than a year later.

46. As an additional act of discipline, Defendant removed Plaintiff from the training group that she was initially assigned, and it did not reassign her to another training cohort until January 2024.

47. For approximately six weeks, from December 2023 until January 2024, Plaintiff continued earning a lesser rate of pay because she was not permitted to fly for Avelo until she completed the required training program.

48.    Avelo did not subject the male instructors to similar discipline even though they publicly yelled at Plaintiff in a loud and angry manner and disrupted other classrooms, and even though they were providing incorrect instruction to pilots that deviated from Avelo's own FAA-approved procedures.

49.    In addition, in February 2024, a male captain who Avelo designated as a check airman, a type of captain who bears the responsibility of training and examining other pilots to ensure that they are up to standards, reported to Plaintiff that he had been "warned" about dealing with Plaintiff and that she was someone who liked to argue with instructors. This male captain also distributed incorrect information about course windows based on online sources that were not FAA-approved and conflicted with Avelo's own FAA-approved manuals.

50.    If an airline's pilot training program lacks rigorous standards and fails to teach pilots how to correctly operate the aircraft, then the pilots who graduate from that training program will be more likely to engage in unsafe practices during actual flight operations when people's lives are at stake.

51.    Plaintiff observed deficiencies in pilot instruction as part of Avelo's pilot training program that included instructors providing incorrect information to Avelo pilots, and she proactively attempted to remedy those deficiencies so that Avelo pilots received proper instruction.

52.    Yet, instead of prioritizing the correction of the flawed training that Plaintiff had identified, Avelo and Bob Lieser viewed Plaintiff's actions as the problem and subjected her to discipline in an effort to deter her from continuing to report issues that Avelo did not want reported.

10

53. These episodes were an early experience in Plaintiff's employment reflecting that Avelo has a greater tolerance for employees who engage in behavior which has the potential to compromise safety than it does for employees who speak out in opposition to unsafe practices – particularly in scenarios when the person potentially compromising flight safety is a man and the person engaging in the opposition is a woman.

C.     Additional Protected Activity, Followed by Retaliation

54. In early 2024, Plaintiff completed her required training program at Avelo, and she began piloting aircraft for Avelo as a Captain.

55. In May 2024, Bob Lieser once again attempted to deter Plaintiff from raising safety concerns.  On or about May 3, 2024, Plaintiff refused to fly an aircraft with a severe flight control issue involving the aileron trim system that rendered it unsafe to fly. Plaintiff identified a problem with the aircraft that could have caused an uncontrollable roll and a catastrophic sudden loss of flight after liftoff.  Because Plaintiff refused to fly that unsafe plane, it was necessary to switch to a different plane and the flight was delayed.

56. Subsequently, Bob Lieser called Plaintiff and made it clear that he was angry with Plaintiff because she refused to fly the plane and it resulted in a flight delay.   Lieser also complained to Plaintiff that her "name keeps coming up" and he was "tired of this." When Plaintiff attempted to explain the safety maintenance issue and that the plane was not safe to fly, Bob Lieser became upset and told Plaintiff that he "did not need a systems lesson" from her.

57. Shortly after Plaintiff refused to fly that plane, Avelo maintenance staff informed Plaintiff that another Avelo plane had an aileron trim system problem during flight with a sudden roll rate.

58. Later in May 2024, Plaintiff raised issues relating to how Avelo recorded duty time for pilots.

59. In order to combat pilot fatigue, which can compromise flight safety, the FAA regulates duty time for pilots. FAA regulations refer to this as the Flight Duty Period, or FDP. As part of that regulatory regime, airlines are required to accurately record duty time for their pilots.

60. On about May 20, 2024, Plaintiff communicated with Avelo flight crew support because she suspected that she would need to file a safety report because her flight schedule had resulted in her exceeding the duty time permitted under the applicable regulations.

61. As part of that interaction with Avelo flight crew support on May 20, 2024, Plaintiff discovered that Avelo had incorrectly entered her sign-in time in order to record her hours as being within the legal limit.

62. Plaintiff informed Avelo flight crew support that Avelo had incorrectly recorded her sign-in time in order to create the appearance that she had not exceeded the legal limit.

63. Nine days later, on May 29, 2024, Bob Lieser angrily called Plaintiff and leveled a false accusation against her based on an interaction with a flight attendant the previous week.

64. As part of this call, Plaintiff denied the false accusation conveyed by Bob Lieser and referred Bob Lieser to another witness who could confirm the falsity of the accusation.

65. On about May 30, 2024, Plaintiff raised additional concerns with Avelo flight crew support about Avelo incorrectly recording duty times.

66. In 2024, Avelo rejected Plaintiff's applications for several promotions. Plaintiff applied for multiple promotions to positions that come with increased pay and prestige, including Line Training Captain, FOQA Gate Keeper, and Simulator Instructor with line flying as a captain. Each time, Avelo rejected Plaintiff and promoted a man.

67. For instance, in May 2024, Ms. Duffy applied for the position of Line Training Captain, someone who trains other pilots in the aircraft. Despite being highly qualified for the role, Avelo denied Ms. Duffy the promotion. Avelo instead promoted Captain Willy Lorenz to Line Training Captain — a male captain whose unsafe line training practices Ms. Duffy subsequently formally reported to Avelo's lead line training instructor, Abelardo Molina, who leads the team of line training captains.

68. On about December 28, 2024, Plaintiff once again raised concerns to Avelo about compliance with legal limits regarding duty time for pilots when Avelo wanted to add another flight to a different and non-scheduled destination to her flight schedule.

69. When Plaintiff indicated that she and her crew did not have sufficient duty hours remaining to take on that additional flight, a supervisor at Avelo threatened to report Plaintiff for refusing to operate, which was a false charge. Threats towards crew members to extend their duty day are contrary to federal regulations included in FAR 117.

70. After that incident, Plaintiff raised concerns with Bob Lieser about compliance with legal limits for pilot duty time, or FDP.

71. On December 30, 2024, Plaintiff once again raised concerns with Bob Lieser and conveyed concerns that Avelo was manipulating certain conditions in an effort to exceed legal duty time for pilots without recording times that reflected a violation.

72. Several days later, on January 3, 2025, Bob Lieser called Plaintiff and leveled a false allegation against Plaintiff involving a purported interaction with gate agents from December 27, 2024.

73. Plaintiff denied engaging in the conduct towards the gate agents alleged by Bob Lieser, and she directed Bob Lieser to a witness who could corroborate that the allegation against Plaintiff was a distortion.

74. One month later, on February 4, 2025, Avelo and Bob Lieser issued Plaintiff a written performance notice and suspended Plaintiff for three days without pay based on the alleged incident with the gate agent from December 27, 2024.

75. On February 6, 2025, Plaintiff submitted a detailed written response to the February 4, 2025, performance notice for inclusion in her personnel file.

76. As part of Plaintiff's February 6, 2025 rebuttal, Plaintiff included information demonstrating that Avelo was disciplining her based on false information and she questioned why Avelo was not following consistent practices during the process that they used to discipline her.

77. As part of Plaintiff's February 6, 2025 rebuttal, Plaintiff shared other relevant information that was pertinent to the events of December 27, 2024, including that Plaintiff had been in conversation with a flight attendant who reported being chastised for using too many safety gloves. On that point, Plaintiff indicated in her rebuttal that the flight attendant should not have been criticized for the usage of safety gloves because flight attendants should be permitted to use as many safety gloves as they need for their safety, and the safety of others, while they attend to the cleanliness and safety of the aircraft.

14

78. As part of her written rebuttal on February 6, 2025, Plaintiff shared how, on pushback on the morning of December 27, 2024, she was asked to look at the front lavatory sink, which was stopped up and not draining. Plaintiff then explained how she requested and used safety gloves to clean out what looked like human feces, and that Plaintiff was able to thoroughly clean and unclog the sink and stopper.

79. Thus, as part of Plaintiff's February 6, 2025 rebuttal, Plaintiff conveyed that Avelo was disciplining Plaintiff based on false allegations, Avelo used an unfair process to effectuate the discipline, Avelo should not be criticizing a flight attendant for allegedly using too many safety gloves because safety gloves are required to protect the health and safety of the crew and others onboard the aircraft - - as illustrated by an example when Plaintiff used safety gloves herself to clean out a clogged drain on the airplane, and that Plaintiff's performance for Avelo includes examples of Plaintiff going above and beyond to serve Avelo, its crew, and its passengers.

D. Plaintiff Reports Dangerous & Unsafe Behavior by Captain in Cockpit; Avelo Retaliates

80. On February 19, 2025, Ms. Duffy flew on Avelo Flight 465 from Tweed-New Haven Airport to Tampa, crewed by Captain David Manopla ("Manopla").

81. Manopla had previously completed Avelo's pilot training program.

82. While Plaintiff was a Captain, she served as a First Officer and "pilot monitoring" on this flight. Avelo did not have enough first officers available to cover a first officer vacancy on that flight, so Avelo paired two captains together and designated Plaintiff as the first officer.

83. During this flight on February 19, 2025, Manopla committed multiple serious violations of FAA regulations and Avelo's FAA-approved procedures, which Ms. Duffy

15

documented in her formal safety report.  The most egregious of those violations — each of which independently constituted a threat to the safety of the aircraft, its crew, and its passengers — are as follows:

- **Failure to Conduct Required Pre-Flight Briefings (14 CFR § 121.315).** Manopla failed to conduct the required pre-flight, route, and emergency briefings before departure in violation of Avelo's FAA-approved procedures.  Section 121.315 mandates that each certificate holder provide, and that flight crewmembers follow, approved cockpit check procedures covering every item necessary for safety before takeoff.  Manopla's failure to brief Ms. Duffy on route, weather contingencies, or emergency procedures deviated from mandatory procedures.

- **Removing Hands From Thrust Levers During the Takeoff Roll (14 CFR § 91.13(a); 14 CFR § 121.542).** Manopla removed his hands from the thrust levers during the takeoff roll — a universally required standard operating practice under Part 121 carrier-approved procedures — and instead "stirred the stick like a fighter pilot." Under 14 CFR § 121.542, no flight crewmember may engage in conduct that interferes with the proper performance of duties during a critical phase of flight.  Takeoff is a critical phase of flight.  Removing hands from the thrust levers during the takeoff roll — before the aircraft has reached "the decision speed" for takeoff, or the point of no return for takeoff, and while the crew must be able to abort instantly — constitutes careless and reckless operation in violation of 14 CFR § 91.13(a) and is a deviation from the airline's FAA-approved Standard Operating Procedures.

- **Not Aware of Aircraft Automation and Not Complying with Pilot Flying Rules.** While Manopla was hand flying the aircraft, he was oblivious to the fact that the

aircraft's auto throttle system dropped the speed of the aircraft to 174 knots at 3,000 feet when the airplane should have been flying at 200 knots.  Plaintiff alerted Manopla to this fact and that it was necessary to increase the speed of the aircraft to 200 knots. At that time, Manopla was the "pilot flying" and Ms. Duffy was the "pilot monitoring." Since Manopla was hand flying and had pilot flying responsibilities, Avelo's FAA-approved procedures mandated that it was Plaintiff's responsibility to make the adjustments to increase the speed of the aircraft to 200 knots.  However, Manopla demonstrated a disregard for those procedures and adjusted the speed of the aircraft himself while he was hand flying.

- **Refusing to Follow Flight Director Guidance or Engage Autopilot in IMC (14 CFR § 91.13(a)).** Manopla refused to follow flight director guidance and refused to engage the autopilot, in violation of Avelo's FAA-approved manuals and procedures.  His actions created additional and unnecessary risk in flight.  In addition, Manopla engaged in these behaviors while the aircraft was operating in Instrument Meteorological Conditions ("IMC") with engine anti-ice activated — a configuration that increases pilot workload and demands heightened adherence to instrument scan and automation protocols.  Operating in IMC without using available flight director guidance or autopilot when weather and systems conditions require it constitutes careless and reckless operation in violation of 14 CFR § 91.13(a).  This conduct exposed the crew and passengers to the risk of spatial disorientation and controlled flight into terrain.

- **Created Unnecessary Risk of Dual Engine Shut Down or Compressor Stall at High Altitude.**  When the aircraft was at high altitude above 35,000 feet, Manopla disconnected the Auto throttle and pulled the throttles way back, instead of using a slow

17

extension of the speed brakes or speed intervention window or updating the FMC to select a slower speed. This action could have caused the airplane to decelerate rapidly, at a high altitude where the air is much thinner. This action was in direct violation of Avelo's FAA-approved procedures which required the use of autopilot and auto throttle as much as possible to prevent excessive airspeed loss, and created an unnecessary risk that the engines would shut down or compressors would stall – which would have been an extremely dangerous situation.

- **False Radio Communication Falsely Suggesting Ms. Duffy Was Incapacitated (14 CFR § 91.13(a)).** Manopla made a false radio communication on the ARINC dispatcher radio frequency falsely suggesting that Ms. Duffy — who was serving as the First Officer — was incapacitated. This conduct appeared intended to intimidate Ms. Duffy regarding the performance of the duties that she was fulfilling and the standards that she was upholding during flight. This false statement could have also triggered an unwarranted emergency response, diverted the flight, caused ground crew resources to be unnecessarily mobilized, and unnecessarily distracted the Air Traffic Control attention and priority from other aircraft, thereby causing delays for other flights. Making false statements in aviation radio communications is prohibited, especially when they are intended to intimidate a member of the crew regarding the performance of their duties, and constitutes careless and reckless endangerment of the aircraft and its occupants in violation of 14 CFR § 91.13(a). This conduct also appeared designed to discredit Ms. Duffy with Avelo's dispatch system. As a result of Manopla's false report that Plaintiff was incapacitated, Plaintiff was removed from the flight crew for the return trip to New Haven.

- **Unilaterally Reducing Reserve Fuel Below Minimum Required Levels (14 CFR § 121.639).** Manopla unilaterally reduced reserve fuel on board below Avelo's required minimum fuel thresholds by disregarding ATC instructions.  FAA regulations under 14 CFR § 121.639 impose mandatory minimum fuel requirements for domestic air carrier operations to ensure that aircraft can safely divert and land in the event of a route change, weather encounter, or emergency.  Reducing fuel reserves below those minimums without authorization from dispatch and without advising ATC threatens the ability of the crew to respond to contingencies and violates the statutory fuel sufficiency requirements applicable to Part 121 carriers.

- **Removing Waypoints From the Flight Management System and Denying Having Done So (14 CFR § 91.123(a); 14 CFR § 91.13(a)).** Manopla removed waypoints from the Flight Management System ("FMS") legs page during the flight, altered the aircraft's cleared route without coordination with Air Traffic Control or Ms. Duffy, and then denied having done so when confronted.  Deviating from an ATC-cleared route by modifying the FMS without authorization could cause a midair collision with another aircraft, and it also violates 14 CFR § 91.123(a), which requires pilots to comply with ATC clearances and instructions.  Doing so while actively denying the modification to the co-pilot demonstrated a disregard for crew resource management and for the safety of the flight that constitutes reckless operation under 14 CFR § 91.13(a).

- **Failure to Use Airborne Weather Radar Correctly in Heavy Precipitation (14 CFR § 121.357).** Manopla failed to correctly operate the airborne weather radar while the aircraft was flying through heavy precipitation.  Section 121.357 requires Part 121 air carriers to install and use approved airborne weather radar equipment when operating in

19

conditions where thunderstorms or other hazardous weather may be encountered. Failing to correctly use the weather radar in heavy precipitation — where accurate weather depiction is essential to route the aircraft safely around hazardous cells — violates 14 CFR § 121.357 and endangered the aircraft by preventing the crew from identifying and avoiding the most severe weather.

- **Failure to Select TOGA Power During an ATC-Issued Go-Around (14 CFR § 91.123(a); 14 CFR § 91.13(a)).** ATC had given instructions and assigned airspeeds, but Manopla failed to comply with these instructions and speeds, which violated federal regulation.  As a result of Manopla's non-compliance with ATC instructions, ATC ordered a go-around, which means that the aircraft was required to cancel its approach and circle the airport again, which created additional safety risks and delays. Then, Manopla failed to select TOGA (Takeoff/Go-Around) thrust when Air Traffic Control issued a go-around instruction.  A go-around is a time-critical maneuver requiring the immediate application of go-around thrust and execution of the missed approach procedure.  Failure to select TOGA on a go-around violates 14 CFR § 91.123(a), which mandates compliance with ATC instructions, and constitutes careless and reckless operation in violation of 14 CFR § 91.13(a).  Insufficient thrust during a go-around risks runway incursion, loss of aircraft separation from preceding or following aircraft in sequence for landing, loss of control due to stalling the aircraft, and controlled flight into terrain.

- **Shutting Down the Wrong Engine During Taxi-In (14 CFR § 91.13(a); 14 CFR § 121.315).**  During taxi-in at the destination, Manopla shut down the wrong engine (engine number 1 on the left wing) due to his distraction from safely taxing the aircraft

— a potentially catastrophic error that could result in loss of aircraft power, ground collision, or inability to safely reach the gate. In addition, since the ground crew are expecting that the engine on the right wing to be shut down, shutting down the incorrect engine increases the risk that a member of the ground crew can be ingested into the engine and killed. Engine shutdown sequence is governed by the aircraft's Approved Flight Manual and the carrier's FAA-approved cockpit check procedures under 14 CFR § 121.315. Shutting down the incorrect engine during taxi-in constitutes careless and reckless operation in violation of 14 CFR § 91.13(a) and a direct departure from FAA-approved aircraft operating procedures. When Ms. Duffy pointed out the error, Manopla shouted profanity at her. In addition, the FAA-approved procedures make it clear that, when it comes time to shut down the number 2 engine while taxing, that function is supposed to be performed by the "pilot monitoring," not the "pilot flying" who is taxing the aircraft and needs to be focused on the flight controls. So, since Manopla was considered the "pilot flying" while taxing the aircraft, he also violated the FAA-approved procedures by personally shutting down the engine.

84. At approximately 4:30 a.m. on February 20, 2025, Ms. Duffy filed a formal, five-page written safety report on Avelo's Vistair Safety Net system documenting Captain Manopla's violations.

85. As part of her complaint about Manopla's conduct, Plaintiff also reported that multiple first officers at Avelo had complained about Manopla, and that some had reported avoiding flying with Manopla by either swapping off of flights or calling out sick.

86. Plaintiff also reported that, according to one first officer, Manopla had an altitude violation in airspace where the required minimum distance between aircraft was reduced

21

(RVSM airspace), thus increasing the risk of an aircraft collision or other catastrophic accident – and that the altitude violation was the result of Manopla deciding to "do things on his own." Thus, based on this report about Manopla that Avelo had previously received from another first officer, Avelo was on notice that Manopla had committed an altitude violation and deviated from ATC clearance – actions that created risks for a midair collision with another aircraft – but Avelo continued allowing Manopla to captain its aircraft.

87. By filing the complaint through Avelo's Vistair system, Plaintiff triggered mandatory reporting of her complaint about Manopla's conduct to the FAA.

88. On February 22, 2025, Ms. Duffy filed a formal written safety report with Avelo concerning Captain Willy Lorenz's unsafe line training practices, including Lorenz's use of prohibited electronic devices in the cockpit in violation of FAA regulations and the FAA-approved Avelo Flight Deck Observer Jumpseat Briefing Card.

89. Avelo's Chief Pilot, Bob Lieser, had knowledge of the safety complaints that Plaintiff filed with Avelo in February 2025, including the complaint about Manopla's unsafe captaining of the aircraft that she filed through Vistair and which triggered mandatory reporting to the FAA.

90. Avelo never interviewed Plaintiff as part of any investigation into the complaint that she submitted through Vistair about Manopla's dangerous activities in flight.

91. Instead of properly investigating the serious safety concerns that Plaintiff raised about Manopla's conduct in flight, Avelo moved quickly to retaliate against Plaintiff.

E.    Avelo's Termination of Duffy's Employment — Fabricated Pretext & No Investigation

92.    On February 27, 2025, days after Plaintiff's protected safety complaints concerning Manopla and Lorenz and her Vistair complaint concerning Manopla that triggered mandatory reporting to the FAA, Avelo and Bob Lieser terminated Plaintiff's employment.

93.    Avelo purported to justify the termination based on a "final incident" where Avelo claimed that Plaintiff allegedly berated a member of the ground crew during a pushback operation.

94.    Avelo and Bob Lieser notified Plaintiff of the purported complaint, and that Avelo was terminating her employment, during the same call on February 27, 2025.

95.    Avelo decided to terminate Plaintiff's employment before meeting with Plaintiff on February 27, 2025, before the company notified Plaintiff about the allegation against her during the meeting on February 27, 2025, and before Plaintiff had any opportunity to respond to the allegations against her.

96.    Plaintiff made it clear during the meeting on February 27, 2025 that she did not engage in the behavior alleged, and she explained to Avelo and Bob Lieser that other members of her crew, including the first officer that she worked with on whichever date that the incident was alleged to have occurred, could verify that Plaintiff did not engage in the conduct alleged.  However, Avelo and Bob Lieser were undeterred.

97.    Avelo and Bob Lieser proceeded with the termination of Plaintiff's employment on February 27, 2025, without conducting any investigation into the "final incident" upon which they were relying as the basis to terminate Plaintiff's employment.

23

98.    Avelo's stated justification is ripe with evidence of pretext, including Avelo offering conflicting information regarding the date of the alleged offense and the name of the person involved. At one point during the termination meeting, Avelo claimed that the incident occurred on a date in February 2025 when Plaintiff was not even working.

99.    Furthermore, the subject matter at issue in the purported complaint — issues relating to wingtip clearance and pushback positioning — are the captain's safety responsibility during pushback operations. As such, Plaintiff's speech on those subjects to the ground crew should not have been the basis for discipline.

F.    Continued Retaliation and Discrimination Post-Termination of Employment

100.   Following the February 27, 2025 meeting, Plaintiff appealed to Scott Hall, Avelo's Head of Flight Operations. As part of Plaintiff's appeal to Scott Hall, she highlighted that she had engaged in protected activity relating to safety reporting and that retaliation against Plaintiff for her safety reporting is against the law.

101.   Scott Hall affirmed to Plaintiff that Avelo would not be reversing the decision to terminate her employment.

102.   However, Scott Hall informed Plaintiff that Avelo would allow her the opportunity to resign in order to protect her employment record on the FAA PRD ("Pilot Record Database").

103.   On March 3, 2025, Scott Hall sent an email to Plaintiff which included the following statement: "If you decide to resign, we will accept it in lieu of a record of termination and your PRD will reflect voluntary resignation." As part of follow-up email, Scott Hall wrote to Plaintiff: "Let me know your decision."

104. Plaintiff accepted Scott Hall's offer of an opportunity to resign and she replied to Scott Hall by email: "My only option for the chance of flying again is to resign leaving my PRD undamaged."

105. Thereafter, Plaintiff filed whistleblower complaints against Avelo with federal agencies, including the FAA and OSHA. These separate complaints to the government were in addition to the Vistair complaint filed by Plaintiff on February 20, 2025, concerning Manopla's unsafe practices in flight, and which triggered mandatory FAA reporting.

106. On or before March 24, 2025, Avelo received notice of the additional whistleblower complaints that Plaintiff filed with the federal government.

107. Three days later, on March 27, 2025, Avelo reported on Plaintiff's PRD that her employment was "terminated not for pilot performance" — a designation that appears on background checks reviewed by every prospective airline employer and effectively blacklists a pilot from the industry.

108. Then, in April 2025, Scott Hall issued a statement to all Avelo flight operations crew regarding a "whistleblower" who had complained to the FAA, and who people understood to be Ms. Duffy. In his April 2025 communication, which is attached to this Complaint as Exhibit A, Scott Hall clearly sought to deter employees from speaking with federal government investigators from the FAA without first speaking with Avelo pilot leadership, and he disparaged Ms. Duffy and her allegations.

109. Even though Avelo neither properly investigated, nor interviewed Plaintiff about, the safety concerns that Plaintiff reported to the FAA, including the alarming and hazardous behavior of Manopla that Plaintiff reported to Avelo and the FAA, Scott Hall recklessly dismissed Plaintiff's complaint to the FAA as "mudslinging," "ma[d]e up stories," and

"unfounded accusations," and discouraged employees from cooperating with FAA investigators without the knowledge of Avelo pilot leadership.

110. In another act of retaliation against Ms. Duffy, Avelo failed to move forward with the conditional offer of employment that it previously extended to Ms. Duffy's husband.  In December 2024, Avelo extended a conditional offer of employment as a pilot to Ms. Duffy's husband.  In January 2025, Avelo requested that Ms. Duffy's husband update his information and confirm his continued interest in employment with Avelo, and he did so in January 2025.  Upon information and belief, in April 2025, Avelo moved forward with hiring pilots who had previously received conditional employment offers from Avelo, and it began new training cohorts for new pilots.  However, Avelo did not include Ms. Duffy's husband in the group of pilots who it hired at that time.

111. In March of 2026, Plaintiff reached out again to Scott Hall to request that Avelo honor his previous offer in March of 2025 to record Plaintiff's separation from Avelo on her PRD employment record as a resignation instead of a termination since Plaintiff replied to Scott Hall at the time to confirm that her only option was to resign in order to protect her PRD.  In March 2026, Scott Hall denied Plaintiff's request.

G.    Sex Discrimination at Avelo

112. Avelo's flight operations culture was also openly hostile to Ms. Duffy as the airline's only female captain.  Male pilots at Avelo explicitly discussed and acted upon the view that Ms. Duffy, as a woman, needed to be controlled and diminished.

113. As part of his explanation for the decision to terminate Plaintiff's employment, Bob Lieser explained that Ms. Duffy "has a superior attitude."

114.    Captain James Kilgore ("Kilgore"), a male captain and training supervisor at Avelo, made a number of admissions to Plaintiff which confirm the existence of various sexist biases and stereotypes which operated against Plaintiff at Avelo.

115.    Kilgore stated that, as a woman pilot, Ms. Duffy "has to be so perfect all the time" that she is annoying and comes across as a "know it all," and that men at Avelo feel they must "put [her] in [her] place."

116.    When asked what specifically men found annoying about Ms. Duffy, Kilgore cited her recitation of the emergency briefing — which Ms. Duffy performed from memory. Kilgore laughed and said, "see this is what I mean," demonstrating that Ms. Duffy's competence itself was a source of male pilots' resentment.

117.    Kilgore also confirmed that he distributed materials promoting the misogynistic "Red Pill" theory, and books such as "No More Mr. Nice Guy: A Proven Plan for Getting What You Want in Love, Sex, and Life," and "Sex God Method," to Avelo male pilots and male flight attendants.

118.    Plaintiff was not the only woman who suffered harm as a result of the sexist culture at Avelo.

119.    In 2023, Avelo and Bob Lieser terminated the employment of another female pilot shortly after she complained to Avelo about the sexist and unsafe conduct of a male captain. In 2023, this female pilot complained to Avelo that a male captain had made sexist and misogynistic statements to her, and had yelled "Shut up, Bitch" at her in the cockpit. As part of her 2023 complaint to Avelo, this female pilot also complained that this male captain had engaged in unsafe behavior in the cockpit during flight, including putting his hands over her hands on the throttle while she was piloting the airplane on

approach and attempting to jerk her hands back and forth while she was piloting the aircraft. Shortly thereafter, Bob Lieser and Avelo grounded the female pilot from additional flights, while the male captain was permitted to continue flying. The female pilot then conveyed to Bob Lieser that she was resigning and providing her two weeks' notice. Nevertheless, within the next two weeks, Bob Lieser called the female pilot and notified her that Avelo was terminating her employment, even though she had already communicated her resignation. Then, Avelo reported the female pilot's employment record on the FAA PRD as terminated, not resigned, causing her further damage.

H.    Disparate Treatment — Male Comparators

120. When male captains at Avelo engaged in similar or more serious conduct as that which Avelo cited as the basis for subjecting Ms. Duffy to discipline and termination, Avelo did not subject them to similar discipline. This disparate treatment further underscores Avelo's discrimination and retaliation against Plaintiff.

121. As previously alleged in this Complaint, male captains and instructors engaged in behavior which had the potential to compromise flight safety. Plaintiff, on the other hand, had a clean flight record without any unsafe practices. Yet, even though Avelo proclaims that "Safety Always" is the company's "number one value," it terminated Plaintiff's employment, failed to properly investigate the safety complaints that Plaintiff reported, and did not discipline the male employees for their unsafe practices.

122. Manopla had a long-standing history of unsafe flying practices that Avelo was well aware of. Multiple first officers had previously reported Manopla to Avelo management; at least one had written directly to the Chief Pilot and to the Vice President of Operations. In addition, Manopla engaged in a heated exchange including profanity with a lead

ground grew manager and caused a flight to be delayed, simply to ride on the aircraft as a passenger to return home to Florida.  Yet, Avelo did not terminate Manopla's employment.

123.   Another male captain physically struck a female flight attendant and was not terminated. After this, Avelo promoted him to line training captain.

124.   Kilgore had a "heated argument" with two gate agents and suffered no adverse consequence.  In Kilgore's own telling, he called Bob Lieser about the incident and Lieser took no action against him.  Kilgore was promoted.

I.     FAA Confirms Violations by Avelo

125.   Notwithstanding Scott Hall's April 2025 communication to Avelo flight staff that disparaged Plaintiff and dismissed the validity of her whistleblower complaint to the FAA, and also requested that Avelo employees speak with Avelo leadership before cooperating with the FAA's investigation, the FAA still identified violations by Avelo as a result of the complaints that Plaintiff filed with the FAA.

126.   In 2025, the FAA notified Plaintiff that "The FAA's Flight Standards Service has completed their investigation of the air carrier safety issues in case # **AAE-EWB-20250317-550**. The investigation substantiated that a violation of an order, regulation or standard of the FAA related to air carrier safety occurred. Accordingly, the FAA is taking appropriate corrective and/or enforcement action. Our office will monitor these actions until complete."

127.   More recently, in March 2026, the FAA issued a public notice that it was proposing $65,000 in fines against Avelo based on Avelo's failure to comply with FAA regulations

regarding mandatory drug and alcohol testing of employees who performed safety-sensitive functions.

128.    As the facts alleged in this Complaint make clear, while Avelo's marketing proclaims that the company operates according to core Values, including "Safety Always" and "Do the Right Thing," Avelo's actual operations reflect a different reality in which Avelo's male dominated pilot leadership acts with a flagrant disregard for legal obligations and regulations – including both laws that prohibit discrimination and retaliation, as well as federal regulations designed to ensure safety in commercial aviation.

## COUNT ONE

**Retaliation for the Exercise of Constitutionally Protected Speech and Petition Rights in Violation of Connecticut General Statutes § 31-51q (as against Avelo Airlines, Inc.)**

129.    Based on the foregoing, Defendant Avelo Airlines, Inc. has subjected Plaintiff to discipline and discharge on account of the exercise of constitutionally protected rights in violation of Connecticut General Statutes § 31-51q.

130.    Plaintiff engaged in protected speech under Conn. Gen. Stat. § 31-51q.

131.    When Plaintiff raised concerns to Avelo on matters of public concern including threats to health and safety and serious wrongdoing, her speech was protected by the free speech provisions of the Connecticut Constitution identified in Conn. Gen. Stat. § 31-51q.

132.    When Plaintiff filed reports and complaints to governmental agencies such as the FAA, Plaintiff also engaged in protected speech on matters of public concern and her speech was protected by the federal and state constitutional provisions identified in Conn. Gen. Stat. § 31-51q.

133. Defendant had knowledge of Plaintiff's protected speech.

134. Defendant subjected Plaintiff to retaliatory actions that included discipline and discharge.

135. There is a causal connection between Plaintiff's protected speech and Defendant's retaliatory actions against her.

136. As a result of Defendant's violation of Conn. Gen. Stat. § 31-51q, Plaintiff has suffered and continues to suffer economic damages including lost wages, lost benefits, and diminished earning capacity; and non-economic damages including emotional distress, loss of enjoyment of life's activities, and harm to her reputation.

137. Defendant also demonstrated a reckless disregard for Plaintiff's legally protected rights, thereby entitling Plaintiff to an award of punitive damages.

138. Plaintiff has incurred attorneys' fees and costs in connection with this action.

## COUNT TWO

### Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964
### (as against Avelo Airlines, Inc.)

139. Based on the foregoing, Defendant Avelo Airlines, Inc. has subjected Plaintiff to discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, as amended.

140. Plaintiff is a female and a member of a protected class under Title VII.

141. She was qualified for the positions that she held and sought with Avelo.

142. Defendant subjected Plaintiff to adverse employment actions and discrimination in the terms and conditions of Plaintiff's employment — including the issuance of disciplinary notices, suspension, termination of employment, and denial of promotions — under circumstances giving rise to a strong inference of sex discrimination.

143. Defendant subjected Plaintiff to disparate treatment as compared to male captains.

144.	Defendant did not consistently enforce its own procedures and standards.

145.	Defendant's treatment of Plaintiff reflects sex stereotyping and bias.

146.	As a result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer damages, including: lost wages and benefits; loss of future earning capacity; diminished career prospects; emotional distress; loss of enjoyment of life's activities, and harm to reputation.

147.	Defendant's discriminatory conduct was undertaken with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages under 42 U.S.C. § 1981a.

148.	Plaintiff has incurred attorneys' fees and costs in connection with this action.

## DEMAND FOR RELIEF

Plaintiff hereby demands Judgment against Defendant Avelo Airlines, Inc., a Trial by Jury, and other relief, including, but not limited to, the following:

1.      Compensatory and economic damages, including, but not limited to, back pay, lost compensation and benefits, and all other economic losses attributable to Defendant's unlawful conduct;

2.      Front pay, or, in the alternative, reinstatement to her position as captain with equivalent compensation, seniority, and benefits, at Plaintiff's election;

3.      Compensatory damages for emotional distress, loss of enjoyment of life's activities, harm to reputation, in an amount to be determined at trial;

4.      Punitive damages under 42 U.S.C. § 1981a and Title VII, and Conn. Gen. Stat. 31-51q;

5.      Equitable relief, including a permanent injunction requiring Defendant to immediately remedy Plaintiff's entry in the Pilot Records Database, and prohibiting Defendant from any further acts of discrimination, retaliation, or interference with Plaintiff's exercise of her constitutional and statutory rights;

6.      Attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and Conn. Gen. Stat. § 31-51q;

7.      Pre-judgment and post-judgment interest as permitted by law; and

8.      Such other and further relief that in law or equity may pertain.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

PLAINTIFF,
KIMBERLY DUFFY


By: /s/ *Todd Steigman*
    Todd Steigman (ct26875)
    Madsen, Prestley & Parenteau, LLC
    402 Asylum Street
    Hartford, CT 06103
    Telephone: (860) 246-2466
    Fax: (860) 246-1794
    Email: tsteigman@mppjustice.com

# EXHIBIT A

 Scott Hall
To FlightOps

Apr 14

5

I have been made aware of some mudslinging, I mean allegations that is going on from a whistleblower who has complained to the FAA. Last week I spent a considerable amount of time with FAA Inspectors not from our certificate, answering their questions and then subsequently providing information regarding our operation.

I have also been in contact with a few crewmembers here that are also having to deal with this issue. If you are contacted by the FAA or by any former employee, I would appreciate if you would reach out to Bob or me so we can ensure that you are not sucked into some rabbit hole or vortex.

For the record, I will never retaliate, discharge, or otherwise discriminate against anyone for providing information relating to air carrier safety violations to Avelo or the Federal Government. But I will not let someone run down current crewmembers, make up stories about pilots, create unfounded accusations about our pilots. and on and on.

Sometimes some people need to "get a life". The dictionary definition of get a life means - start living a fuller or more interesting existence.
Scott



2